Case number 13-4257, Kenneth R. Mantell v. Health Professionals Ltd. Parole. Arguments on the dispute between Kenneth R. Mantell and Brenda Johnson for the offense. May it please the court, my name is Brenda Johnson. I'm here on behalf of the family of Kenneth R. Mantell who hanged himself while in pretrial detention in the Portage County Jail. I would like to reserve two minutes of my time. You may. Thank you. This is an appeal from two orders arising from the ensuing 1983 and state law wrongful death action following Kenny's death. One is the order granting summary judgment in favor of the defendants, Portage County, and the two individual officers whose conduct is at issue, Nathan Kreider and Sergeant Dan Cardinal. The other order is an order striking the expert affidavit that we submitted as part of our opposition to the motion for summary judgment, ostensibly because the defendants' counsel chose not to depose our expert during the time period for expert discovery that was set forward by the district court. The background on this case is this. with his estranged girlfriend, a woman named Lindsay Hamilton. He was arrested by a Streetsboro officer named John Hurley who remanded Kenny to the Portage County Jail. In the course of remanding Kenny to the Portage County Jail, he told the booking officer at the time, Officer Kreider, or more precisely, he actually told the sergeant, Dan Cardinal, who was on shift that day, in earshot of Nathan Kreider, that the girlfriend, the victim, had told him, the arresting officer, that Kenny might hurt himself in jail, which Officer Kreider testified he understood to be her saying that he might commit suicide. Now Officer Kreider has testified that he did not, in fact there is no debate about this, neither Officer Kreider nor Sergeant Cardinal conveyed that information to the two nurses who were responsible for conducting the medical intake when Kenny was being booked, Nurse D'Alessandro and Nurse Balk. I understand you sued them originally but you're not appealing the dismissal of them. Is there a reason for that? There's a reason for that and the reason is we don't actually have any criticism of their conduct at this point because the gravamen of our real problem here is actually with the fact that the booking officers did not pass on information to these nurses that the nurses testified would have changed the manner in which they assessed Kenny. They both testified that if they had been told what Officer Kreider said he was told, which is that the victim in this domestic violence thing, a woman who was intimately familiar with Kenny and knew him, had said that Kenny would hurt himself in jail. If they had been told... He wouldn't hurt himself? I mean you originally said might hurt himself. There is... You've changed a little bit here. Well, I'll say this. People's... What was the question to the nurse as to her recommendation would have changed if you had known... Here. I can tell you specifically. My understanding it doesn't quite match up with what the statement was, that it wasn't an accurate representation of what, this is hearsay anyway, the hearsay statement of the girlfriend to Hurley that wasn't passed on. I'm not sure the hypothetical question to the nurse matched up with what the hearsay statement of the girlfriend allegedly was. Well, let me address that, and I'm going to address it this way. This is, I mean, the standard here is deliberate indifference, right? It has the objective component, but it also has a subjective component. The subjective component is about what the specific state actors, in this case, Officer Kreider and Sergeant Dan Cardinal, understood that they had been told. Okay? And that's why it's not necessarily that important that there's some moving around in the course of cross-examination of the girlfriend as to what exactly she said, or whether there are some inconsistencies in what Officer Hurley says about what he heard and understood. But it goes to the objective component, doesn't it? No, it does not. And, in fact, this court recently addressed that issue in a case that I confess is not in our briefing, but it was, if it excuses at all, was issued a few days before my initial brief, and that's the case of Gunther B. Castaneda, which is an unpublished opinion that came out in 2014, where this court addressed the relationship between subjective knowledge of the risk and the objective prong and rejected the argument that the objective prong is determined in terms of what was subjectively available, the information that was subjectively available to the party. The quote is, Whether a medical need is obvious does not depend on whether it was, in fact, obvious to anyone at the time. That issue goes to the subjective component, and I'm quoting the opinion. Accordingly, the court's held that the objective prong is satisfied if an ordinary person would consider the condition serious if he knew of it, and whether or not he knew goes to the subjective component. So tell us then, because you looked like you were getting to the depositions. Oh, yes. Tell us what exactly Crider says he knew and did not pass on to the nurses, presumably, or at least I think it's stated, because the nurses are doing the evaluation, and he didn't think there was anything different between what he knew and what they knew. So tell us why that's not right. He didn't think it was, to be precise, he didn't think it was important to pass it on. He didn't know for sure when anybody had actually asked of Kenny during the intake. But here's the specific. This is from page 45 of Officer Crider's deposition. When he was asked, specifically, when Officer Hurley came in and brought Mr. Mantell, what did he tell you about Mantell? And Officer Crider answered, The first thing he said was that he hasn't been giving him a problem, but that he did have a dual domestic violence offense. I believe he was, and there's some clarification on what that was. And then he said, then he was asked, What else did Hurley tell you? And he answered, After the initial screening, our initial screening, the nurses' initial screening, and the pat-down, as we were walking away, Patrolman Hurley said that the victim said that Mr. Mantell might be suicidal. Now there was some follow-up questioning. He was asked, Now are those the exact words that Hurley used? And he said, I don't know. I can't remember if he said if he was going to do something or if he said suicidal, but it was all kind of implied. Now this gets straight to what Crider understood he was being told, whatever the wording was. When did Crider learn this? Now you said that this was after the initial screening and after the nurses had seen it. There are two phases to the screening that goes on in the Portage County Jail. I've never been there, so I don't know the word for it. I'm taking the word of the parties to the case and the staff. But I believe you just said that Crider did a screening and then the nurses did a screening, and then Hurley told Crider subsequent to those. This is a critical point, actually, and I'm glad you asked about it because there are two phases to the nurses' screening. There's an initial screening that the booking officer does, which is basically just to make sure that they don't have anything on them, things like that. Then they remand them over to the intake nurses, who do a first paper questionnaire screening, and then they come back and they do a second screening. And it was in between the period of time in which the nurses do this first intake screening. Kenny's still in the booking vestibule, or at least somewhere near it. He's still in the booking area. I mean, I'd have the exact term for the room he was in, right? But he's still in the booking area, and the nurses were not done with him. They left him, they went off to do medical rounds, where they dispensed medications to the various inmates in the jail, and then were coming back to complete this intake. And Crider knew at that point that he's being told, because this is the initial screening and the nurse's initial screening, he refers to it as initial screening. He understands it's not done. And there's more testimony on this area. But when he was asked again, now are those the exact words that Hurley used? He said, I don't know. I can't remember if he said he was going to do something or if he said suicidal, but it was all kind of implied. Okay. And then Crider follows on. He might inflict self-harm. I don't know the exact words he said. Might be suicidal was a follow-up question again. Might inflict self-harm. Crider says, I don't think he would have used those words, but might hurt himself would probably have been better. Either way, it was might hurt himself, which is something that Crider's testimony indicates he took to mean that there was a suicidal impulse, that he'd been warned that Kenny might commit suicide. Now, you had asked, what did the nurses say? What was the question that the nurses were asked? And I can answer that. Nurse D'Alessandro, who was the senior nurse, Nurse Balk was a trainee, so she was experienced but not necessarily running the show that day. This is the question that he was asked. She was asked, if Lindsay testifies, hypothetically, that she told Officer Hurley that someone needs to keep an eye on Kenny because if they don't he will hurt himself. He will hurt himself. Will, might. No, that's a big difference. I think that's a difference that a jury has a right to weigh and that shouldn't have been... It's a hypothetical question that's inconsistent with the facts. It's therefore an improper question. I assume there must have been an objection to the form of it. But whatever, you cannot have a hypothetical question that's inconsistent with the facts of the case. And what we have is might. Will or shall is much more different. And it goes to a deliberate indifference if it's relatively certain it's going to happen. I do think I need to respectfully disagree. Tell me why. Why do you disagree? Here's one thing I want to say. That's not even something that the district court got to. Well, I don't care. I mean, I can affirm them for any reason at all. I understand that. I understand that. I think the difference between will and might is something that a jury could weigh. Well, yes, that's correct. A jury could consider it. But if you're talking about a deliberate indifference standard, keep an eye on him. He might hurt himself. What heightened scrutiny does that have over any prisoner? I think this distinction is one where a jury could look to what, I think right now, is really a semantic difference and weigh this. And that it should have been submitted to a jury. And that it is a question that a jury should have been allowed to decide. Is there any discussion in the record of the depositions of what Crider knew that the nurses did, asked in this case, or generally asked? In other words, one of the ways to look at this is, the information that he had, was there any reason that he would have believed that this wasn't getting picked up, that the nurses, I take it, in fact, asked some questions about suicide? They did, and there's no dispute that Kenny... And now you say those were fine, the nurses did a good job. Right, right. And that's because the only information that was available to the nurses through their regular intake was the information that Kenny self-disclosed, which was that he had, at some point in a few years prior, attempted suicide. And otherwise, he disclosed nothing else about the extent to which he might have been considering it in the immediate future. Well, then they did ask questions, though, didn't they? The usual sort of, you know, do you have any suicidal ideation? Do you think you might hurt yourself or others? Which would be the kind of questions that you would ask of someone of whom it was said he might hurt himself. Sure, but if he... I mean, if you bring in people for stock fraud, you don't usually ask them those questions, do you? Well, actually, to be honest, I think any time that somebody's being remanded, they ask the same questions when you're coming in for stock fraud, petty theft, or... But the reason that this information is important, and other courts have found this information important, other circuits have found this important, is that people who are suicidal do not always self... don't always self-disclose. And if there's information available from another source... I mean, this is essentially medical information. And this court's held that medical information coming from family members that comes into the knowledge of a booking officer or an arresting officer that indicates that there is some risk is something that should be taken seriously. It should be... Okay, counsel, your time's up. Two minutes for rebuttal. Thank you very much. May it please the court, my name is Frank Scaldone, and I represent the individual defendants, Officer Crider and Cardinal, as well as Portage County. I ask the court to affirm the district court's decision because the plaintiffs have simply failed to meet the burden to demonstrate a constitutional violation on summary judgment. In fact, the record does not support a constitutional violation. This failing is fatal to all the claims that they bring here today. The plaintiff must establish that Mantell demonstrated a strong likelihood that he would commit suicide and that the officers were deliberately indifferent to that likelihood. Now, Mr. Mantell did not show any indication that he was depressed or harbored any thoughts of self-harm. All the officers found him cooperative, no unusual behavior. He was calm. And that's Crider's deposition at page ID 1496. But it's the testimony of every other officer who encountered him. There was no statements by Mr. Mantell indicating self-harm or actions indicating that he would commit self-harm. Did he report to the nurses, though, that he had had a previous episode of attempted suicide? They did not. I think I heard your question correctly. Did they convey the statement Hurley made? No, no, no. Oh, I'm sorry. No, he eventually told the nurses that at one time, 5 years previous, that he had had a suicide. He, Mantell, himself. Oh, yes, absolutely. He told the circumstances surrounding it. And this was 4 to 6 years earlier that he received treatment for it, that he tried to overdose, I think, on Motrin. And he was quite specific and descriptive on the circumstances surrounding that. And I forget who asked the question, but Officer Kreider did observe Mantell answer the question. And according to Kreider, at deposition page 50, he said he observed that Kreider made no, there was no indication he answered quickly with eye contact. So Kreider is overhearing, because this is like one big room? Because I did have the impression that he knew what the nurses were asking and what they were being told. That's the impression that I got. And where I got that impression was, and I'm sorry I don't have the page ID number, it looks like at deposition of Kreider at page 50. But the part you were just reading, he says he heard the nurses ask and heard Mantell answer? Exactly. That's at 45 or at 50? I believe that is at 50, I have that there. And his testimony was, quote, he didn't hesitate, he being Mantell, didn't hesitate when the nurse asked him, are you feeling suicide or hurting yourself or somebody else? He said, no. So then Kreider's decision not to volunteer or pass on the additional information he had was at least in part in the context of his knowing the conversation between the nurses and Mantell. Precisely. I think with regard to what exactly was said, you go back to what the ex-girlfriend who was the victim of the domestic violence had told Officer Hurley, and it seemed to be done in passing. That is at page ID number 126. Your adversary said, and it seems to me right, that whatever occurred between Hamilton and Hurley is not as important or not important at all as what happens between Hurley and Kreider. Correct. That's all Kreider knows. But Hurley essentially put it, because the testimony is a little bit, it wasn't recorded so there's not specificity. I think it does, and Hurley said that he passed on what Ms. Hamilton had told him. Her testimony, which is at that page site, was essentially keep an eye on him and that he had passed, that he might be suicidal, construing the facts most favorably. But when she was asked by Hurley, did you tell him specifically that he attempted suicide in the past, she said no. When asked did you tell Officer Hurley specifically whether Mantell ever mentioned suicide in the past, no. Did you ever tell him specifically that Mantell was threatening to harm himself, that he had threatened that day to harm himself, no. So the testimony in his understanding is consistent that it certainly was might and not would or demonstrate a present. This is all opinion from a lay witness. It's not really facts. Correct. It would be different, I think, if there's factual matters that are not conveyed, but a lay witness's opinion as to somebody's mental state, it's not worth a heck of a lot. Anyway, I think it's a little different than failing to pass on medical evidence, that's all. I agree absolutely. I think that the nurses in their questioning, they evaluated him firsthand and found that there was, I mean, no one, not even the medical personnel, thought that he was suicidal or that he showed any indication that he would commit self-harm. And even the interactions with Kreider, there was general conversation about, brief conversation about music, there was future contemplating discussion about how the bond process works. So all the facts are, there's no indication that there was a strong likelihood, even a likelihood, that he would commit self-harm. You started out by saying that they must, as I understood it, the plaintiff must demonstrate that your clients knew of a strong likelihood that he would commit suicide. Is that phrase, strong likelihood, from some particular case or document? Absolutely. In the context of suicide cases, that is the standard. And I want to say it's the gray case, but it's certainly in our briefing. And if you'd like, I can locate it. I was just kind of focusing on strong as an adjective as opposed to some or significant. We frequently play around with those words. Strong is a strong term, so I wanted to get your best. I do say for a specific reason that the Sixth Circuit has emphasized that. And there's Gray v. City of Detroit, 399 F. 3rd, 612. I believe the pinpoint site is 616, and that's a Sixth Circuit case, 2005. In my briefing, I cite the Barber case as well, but it's pretty well established that that is the standard in the Sixth Circuit. So for once, an attorney's representation of strong really means strong. A later case from this court uses a significant likelihood. I don't know what difference that makes, especially under the circumstances of this case where there just isn't any indication, strong, significant, or even a likelihood that he would commit suicide. I mean, hindsight is 20-20, and even the officer says he wished that he did things differently, but that doesn't demonstrate a strong likelihood, their knowledge of a strong likelihood that Mr. Mantel would unfortunately commit suicide. In addition to that, that makes it even more difficult for the plaintiffs in this case is the doctrine of qualified immunity, and the plaintiffs must show that it is beyond debate that under the specific circumstances of this case that the officer would be on notice that his conduct was unconstitutional. The plaintiff didn't put forth any case law that would support that that I can glean. So again, the officers are also entitled to qualified immunity. Going to the entity, of course, without a constitutional violation, you cannot have a Monell claim against the entity. Here, even if the constitutional violation was established, which it certainly cannot be, the policy here did not, there was no policy that was the driving force or that caused Mr. Mantel's injury. Here, the testimony is clear that the policy requires that information be passed along, so the policy couldn't be the moving force here. There's simply, in sum, I mean, the critical point in the theory of our presentation here today is the plaintiffs simply failed to demonstrate a strong likelihood that Mantel would commit suicide and that that significant risk was disregarded. Unless the court has any questions, we'll rest on our argument in the briefing and ask this court to affirm the district court's decision. Thank you. I guess the other issue is the striking of the expert's affidavit, and I've got to be honest that I didn't spend a lot of time on this, but tell me what the district court ruled, what was the ruling striking the affidavit? My understanding of the ruling to strike the affidavit was that the parties, there was a discovery deadline for expert depositions to be completed. Judge Adams, anyone who practices in the Northern District, knows that he runs a tight ship. The parties, all of the parties, agreed to have those depositions take place after the expiration of that discovery deadline. And to avoid the prejudice that would be the parties submitting affidavits and then not have the opportunity to depose the experts, I think that was the basis for the striking of that affidavit. But I point out as well is that there's two things. One, with the lack of a constitutional violation, the issue on striking the expert's affidavit really, I think it would be a harmless error, even if it was an error at all, which I don't think it is, because an expert obviously can't usurp the court's power to determine deliberate indifference. In other words, the expert can't say that Officer Kreider acted deliberately indifferently because it would simply be a legal conclusion, and that's the purview of the court. And again, it's an abuse of discretion standard, and I don't mean to be flippant, but the Sixth Circuit has held that a district court's order on these type of issues to be an abuse of discretion must strike the court with the force of a five-week-old, unrefrigerated dead fish. So, I mean... I said that. Did you? Judge Nelson. I mean, it just... Quotation. It just doesn't... You know, it's managing... I mean, it's really managing the docket. So I'd ask the court to affirm. Thank you. We have two minutes for rebuttal. Thank you. I'll keep this brief. First off, I want to point out, again, on this issue of might, will, whatever, there is conflicting evidence as to how the nurses would have reacted even if what they had been told was simply that the girlfriend had told Hurley to keep an eye on him. And this is from Nurse Falk's deposition. That's page ID 2175, page 67 of her deposition. She was asked specifically from the supplemental report, that Hurley report, from the language that appears in his report, which we believe is actually some of the weakest in this on our case. She was asked. Now, the part here from his report where it says, Lindsay did ask me to keep an eye on Kenneth. She said that was never conveyed to her. And then when she was asked whether that would have been useful information for her in her assessment, she said yes. When asked why. When you said from a report, is this Hurley? This is a report reflecting what Hurley said. This is Hurley's written report. Hurley's version of what Lindsay said. Keep an eye on him. Nurse Falk says she would have liked to have had that information, and that if she'd had that information, quote, well, then he probably would have been put on some sort of watch, most likely suicide watch. So even if it was just keep an eye on him, it would have made a radical difference in his treatment. Second, addressing the issue of whether. Would you say that it may have made a difference? I mean, isn't that. That's something a jury can look. There's something there for a jury to look at and consider, and to look at how that sounds when she says it may have made a difference. That's a tone of voice thing. And another thing about whether or not lay witnesses, lay people with knowledge of the person have any special expertise. There's been more than one court. Coleman versus Parkman in the Eighth Circuit and Calvary versus Shepard in the Seventh, both involved failures to pass on warnings about suicide that were passed on by lay people who were familiar with the detainee, not by medical experts, but by people who knew them, parents, acquaintances who said, Officer, he's going to hurt himself in jail. Counsel, I think your time has expired, and my colleagues have any further questions? Okay. Thank you. The case will be submitted.